UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x
                                        )
CURTIS JAMES JACKSON III, P/K/A "50     )
CENT,"                                  )
                                        )
                         Plaintiff,     )     No. 08 CV 6545 (NRB/RLE)
                                        )
          - against -                   )     **FILED UNDER SEAL -**
                                        )     HIGHLY CONFIDENTIAL,
TACO BELL CORP.,                        )     SUBJECT TO PROTECTIVE ORDER
                                        )
                         Defendant.     )
                                        )
---------------------------------------------------x


**TACO BELL'S MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Robert W. Lehrburger
Peter C. Harvey
Jason S. Gould
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel:  (212) 336-2000
Fax:  (212) 336-2222

Attorneys for Defendant Taco Bell Corp.

**REDACTED VERSION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ...................................................................................1

I.  JACKSON'S LANHAM CLAIMS FAIL BECAUSE HE HAS
    NO PROOF THE OFFER LETTER MADE ANY IMPLIED
    STATEMENT OF ENDORSEMENT .............................................3

II. DISPUTED ISSUES OF MATERIAL FACT PRECLUDE
    SUMMARY JUDGMENT FOR JACKSON UNDER
    TRADITIONAL LIKELIHOOD OF CONFUSION ANALYSIS ......................8

III. TACO BELL HAS SUBSTANTIAL DEFENSES
     TO THE LANHAM ACT CLAIMS...............................................18

     A.  Use Of Jackson's Name Was Nominative Fair Use...............................18

     B.  The First Amendment and Newsworthiness Defense...........................20

IV.  DISPUTED ISSUES OF MATERIAL FACT PRECLUDE
     SUMMARY JUDGMENT OF JACKSON'S ENTITLEMENT TO
     MONETARY DAMAGES ..............................................................22

V.   DISPUTED ISSUES OF MATERIAL FACT PRECLUDE
     SUMMARY JUDGMENT ON EXCEPTIONAL CASE STATUS.................24

CONCLUSION..........................................................................................25

i

## TABLE OF AUTHORITIES

### CASES

*Allen v. National Video, Inc.,*
    610 F. Supp. 612 (S.D.N.Y. 1985) ................................................................10

*Audi AG v. Smith,*
    592 F. Supp.2d 246 (N.D.N.Y. 2008) ...........................................................19

*Blue Bell Creameries, L.P. v. Denali Co., LLC,*
    2008 U.S. Dist. LEXIS 58083 (S.D. Tex. July 31, 2008) ...........................7

*Bowen v. New York News, Inc.,*
    522 F.2d 1242 (2d Cir. 1975) .......................................................................22

*Brennan's Inc. v. Brennan's Restaurant, L.L.C.,*
    360 F.3d 125 (2d Cir. 2004) ...........................................................................3

*Brockmeyer v. Hearst Corp.,*
    248 F. Supp.2d 281 (S.D.N.Y. 2003) ...........................................................11

*Cadbury Beverages, Inc. v. Cott Corp.,*
    73 F.3d 474 (2d Cir. 1996) .....................................................................11, 15

*Cairns v. Franklin Mint Co.,*
    292 F.3d 1139 (9th Cir. 2002) ......................................................................19

*Chambers v. Time Warner,*
    2003 U.S. Dist LEXIS 3065 (S.D.N.Y. March 4, 2003) ..............................3

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002) .........................................................................19

*Clark v. America Online, Inc.,*
    2000 U.S. Dist. LEXIS 17368  (C.D. Cal. Nov. 30, 2000) ...........................19

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc.,*
    886 F.2d 490 (2d Cir. 1989) ....................................................................20, 22

*Cumberland Packing Corp. v. Monsanto Co.,*
    140 F. Supp.2d 241 (E.D.N.Y. 2001) .............................................................6

*Downing v. Abercrombie & Fitch,*
    265 F.3d 994 (9th Cir. 2001) ....................................................................5, 16

*Echo Drain v. Newsted,*
    307 F. Supp.2d 1116 (C.D. Cal. 2003) ...........................................................7

*El Greco Leather Prods. Co. v. Shoe World, Inc.*,
    806 F.2d 392 (2d Cir. 1986) ........................................................................16

*Estee Lauder v. Gap, Inc.*,
    108 F.3d 1503 (2d Cir. 1997) ..........................................................................9

*Facenda v. N.F.L. Films, Inc.*,
    542 F.3d 1007 (3d Cir. 2008) ......................................................................5, 8

*Georg Basch Co. v. Blue Coral, Inc.*,
    968 F.2d 1532 (2d Cir. 1992) ........................................................................23

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
    82 F. Supp.2d 136 (S.D.N.Y. 2000) ..........................................................24-25

*Gordon & Breach Science Publishers, S.A. v. American Inst. of Physics*,
    166 F.3d 438 (2d Cir. 1999) ..........................................................................24

*Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185-86 (9th Cir. 2001) .........................21

*Inc. Pub. Corp. v. Manhattan Magazine, Inc.*,
    616 F. Supp. 370 (S.D.N.Y. 1985) ................................................................12

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*,
    80 F.3d 749 (2d Cir.1996) ..............................................................................25

*Johnson & Johnson Consumer Cos. v. Aini*,
    540 F. Supp.2d 374 (E.D.N.Y. 2008) ............................................................14

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*,
    19 F.3d 125 (3d Cir. 1994) ..............................................................................6

*Johnson & JohnsonMerck Consumer Pharm. Co. v. Smithkline Beecham Corp.*,
    960 F.2d 294 (2d Cir. 1992) ............................................................................5

*Lerman v. Flynt Distrib. Co.*,
    745 F.2d 123 (2d Cir. 1984) ..........................................................................21

*Mattel, Inc. v. MCA Records, Inc.*,
    296 F.3d 894 (9th Cir. 2002) ........................................................................21

*Medici Classics Prods. LLC v. Medici Group LLC*,
    590 F. Supp.2d 548 (S.D.N.Y. 2008) ............................................................14

*Mejia & Assocs., Inc. v. IBM Corp.*,
    920 F. Supp. 540 (S.D.N.Y. 1996) ................................................................12

*Metro Kane Imports, Ltd. v. Rowoco, Inc.*,
    618 F. Supp. 273 (S.D.N.Y. 1985) ................................................................10

*New Kids On The Block v. News America Publishing,*
    971 F.2d 302 (9th Cir. 1992) .................................................................................18, 19, 20

*Nora Bevs., Inc. v. Perrier Group of Am.,*
    269 F.3d 114 (2d Cir. 2001) ............................................................................................14

*PPX Enters. Inc. v. Audiofidelity Enters. Inc.,*
    818 F.2d 266 (2d Cir. 1981) .......................................................................................23, 24

*Physicians Formula Cosmetics, Inc. v. West Cabot Cosmetics, Inc.,*
    857 F.2d 80 (2d Cir. 1988) ..............................................................................................9

*Playtex Prods., Inc. v. Georgia-Pacific Corp.,*
    390 F.3d 158 (2d Cir. 2004) ..........................................................................................8-9

*Polaroid Corp. v. Polarad Elecs. Corp.,*
    287 F.2d 492 (2d Cir. 1960) ..........................................................................................3, 9

*RJR Foods, Inc. v. White Rock Corp.,*
    603 F. 2d 1058 (2d Cir. 1979) ..........................................................................................6

*Ralston Purina Co. v. Thomas J. Lipton, Inc.,*
    341 F. Supp. 129 (S.D.N.Y. 1972) .................................................................................10

*Resource Developers, Inc. v. The Statue of Liberty-Ellis Island Found., Inc.,*
    926 F.2d 134 (2d Cir. 1991) ............................................................................................23

*Rogers v. Grimaldi,*
    875 F.2d 994 (2d Cir. 1989) .........................................................................................4, 20

*Star Indus., Inc. v. Bacardi & Co.,*
    412 F.3d 373 (2d Cir. 2005) .......................................................................................12, 14

*Streetwise Maps, Inc. v. VanDAM, Inc.,*
    159 F.3d 739 (2d Cir. 1998) ............................................................................................16

*The Sports Auth., Inc. v. Prime Hospitality Corp.,*
    89 F.3d 955 (2d Cir. 1996) ........................................................................................11, 15

*Tiffany (NJ) Inc. v. eBay, Inc.,*
    576 F. Supp.2d 463 (S.D.N.Y. 2008) .........................................................................19-20

*Time Warner Cable, Inc. v. DirecTV, Inc.,*
    497 F.3d 144 (2d Cir. 2007) .............................................................................................5

*Tin Pan Apple, Inc. v. Miller Brewing Co.,*
    30 U.S.P.Q.2d 1791 (S.D.N.Y. 1994) .............................................................................23

*Tin Pan Apple, Inc. v. Miller Brewing Co.*,
 737 F. Supp. 826 (S.D.N.Y. 1990) ...................................................................10, 16

*Twin Peaks Prods., Inc. v. Publications Int'l, Inc.*,
 996 F.2d 1366 (2d Cir. 1992) ...................................................................................22

*U.S. Conf. of Catholic Bishops v. Media Research Ctr.*,
 432 F. Supp.2d 616 (E.D. Va. 2006) .........................................................................7

*Univ. of Kan. v. Sinks*,
 565 F. Supp.2d 1216 (D. Kan. 2008) ........................................................................7

*Virgin Enter. Ltd. v. Nawab*,
 335 F.3d 141 (2d Cir. 2003) ................................................................................9, 11

*W.W.W. Pharm. Co. v. Gillette Co.*,
 984 F.2d 567 (2d Cir. 1993) ......................................................................................9

*WE Media, Inc. v. Cablevision Cys. Corp.*,
 94 Fed. Appx. 29, 32 (2d Cir. 2004) .......................................................................14

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*,
 423 F.3d 137 (2d Cir. 2005) ....................................................................................19

*Yankee Publ'g, Inc. v. News Am. Publ'g, Inc.*,
 809 F. Supp. 267 (S.D.N.Y. 1992) ..........................................................................20

## STATUTES

15 U.S.C. § 1114.....................................................................................................................3

15 U.S.C. § 1117(a) ..............................................................................................................24

15 U.S.C. § 1125(a) ................................................................................................................3

New York Civil Rights Law §§ 50-51 ..................................................................................24

# INTRODUCTION[1]

In June 2008, Taco Bell's public relations firm Cohn & Wolfe sent a letter from Taco Bell to rapper 50 Cent extending a light-hearted but sincere offer to participate in a public relations event (the "Offer Letter"). (TB Facts 25, 28, 83-85; Gould Decl., Ex. 19.) The Offer Letter proposed Taco Bell would make a $10,000 donation to a charity of Jackson's choice and feed Taco Bell patrons for free if Jackson visited a Taco Bell restaurant, rapped his order and changed his name for the day from 50 Cent to 79, 89 or 99 Cent, which were values of items on Taco Bell's Value Menu. (*Id.* 28, 84; Gould Decl., Ex. 19.) In addition to sending the Offer Letter to Jackson, Cohn & Wolfe also provided it to news outlets so they could report news of the offer. (*Id.* 48, 100, 109-110.) Some online media outlets opted to report the story, but none reproduced the Offer Letter or ran it as advertising. (*Id.* 113.)

Taco Bell's executives hoped that Jackson would accept the offer (*Id.* 87, 90), and, before finalizing the Offer Letter, revised its terms to make it more inviting to him. (*Id.* 26, 88.) Consistent with public offers that Taco Bell had extended in the past, Taco Bell also intended to make people laugh. (*Id.* 9, 25, 73-74.) ██████████████████████
████████████████████████████████

Taco Bell certainly did not intend to cause confusion, nor did it. (*Id.* 57, 118, 120-124.) The Offer Letter explicitly and repeatedly used offer language by stating "here's our offer of change to you" and concluding with we "hope you accept our offer." (*Id.* 28, 84; Gould Decl., Ex. 19.) In informing the press, Cohn & Wolfe provided the complete Offer Letter and a cover email explaining the challenge, and, like the Offer Letter itself, never stated or suggested

---

[1] This introduction and statement of facts is based on Taco Bell's Response to Plaintiff's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 (referred to as "TB Facts ___" throughout).

that 50 Cent had agreed to its terms or endorsed or sponsored Taco Bell. (*Id.* 48, 51, 100, 118-119; Gould Decl., Ex. 35 at C&W 1062-63.)  Every news outlet covering the story accurately reported it as an offer or challenge. (*Id.* 57, 120.)  And, by his own admission, ████████████

████████████████████████████████

████████████████████████████████████████

████████████

       Jackson could have accepted Taco Bell's offer.  He also could have ignored it or chuckled along with others.  Had he done so, the story likely would have passed within a day. Instead, less than a day after news of the offer first appeared, Jackson responded with a press statement denouncing the offer and threatening "When my legal team is finished with them, Taco Bell is going to have a new corporate slogan: 'We messed with the bull and got the horns!'" (*Id.* 55, 61, 116.)  Jackson's provocative response spurred additional news coverage and online commentary as did his filing this lawsuit. (*Id.* 117.)

       Jackson's current motion seeks summary judgment on two of his Lanham Act claims and two additional issues that depend on establishing Lanham Act liability – right to damages and declaration that the case is exceptional.  Disputed issues of material fact preclude summary judgment for Jackson on all those issues, most notably the facts required to determine likelihood of confusion, the pivotal inquiry for his Lanham Act claims.  There cannot be likelihood of confusion that 50 Cent endorsed or sponsored Taco Bell from a letter that expressly declared itself to be an offer and where all or virtually all recipients of the letter demonstrated in their reporting that they were not confused.  Jackson's motion on the Lanham Act claims and against Taco Bell's substantial defenses to them should be denied.

As for Jackson's right of publicity claim, Taco Bell acknowledges that under the circumstances of this case Jackson should be able to establish a violation of New York Civil Rights Law § 51.  Accordingly, notwithstanding the failure of proof as to likelihood of confusion, damages and other issues that are not elements required for that claim, Taco Bell consents to entry of partial summary judgment of liability for the right of publicity.

## I

### JACKSON'S LANHAM CLAIMS FAIL BECAUSE HE HAS NO PROOF THE OFFER LETTER MADE ANY IMPLIED STATEMENT OF ENDORSEMENT

Jackson seeks summary judgment on two Lanham act claims – infringement of his federally registered "50 CENT" trademark under 15 U.S.C. § 1114, and false endorsement under 15 U.S.C. § 1125(a).  As Jackson acknowledges (Jackson Br. 16-21), both claims turn on a common element – likelihood of confusion (sometimes "LOC").[2]  In traditional trademark cases, likelihood of confusion is determined by assessing a non-exclusive list of factors known as the *Polaroid* factors.  *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).

But this is not a traditional trademark case.  There is no allegation, let alone proof, that Taco Bell put out any goods or services under the 50 CENT mark such as might be the case if it offered the "50 CENT Taco" or "50 CENT Rap Menu."  Rather, Jackson's claims, no matter under which statutory provision they are framed, share the same basic allegation: that the Offer Letter was an advertisement falsely implying that Jackson endorsed or sponsored Taco Bell.  Jackson's Complaint makes this plain by alleging, commonly to all claims, that the Offer Letter

---

[2] *See, e.g., Brennan's Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 130 (2d Cir. 2004) (considering "the pivotal question: likelihood of confusion"); *Chambers v. Time Warner*, 2003 U.S. Dist Lexis 3065, at *27 (S.D.N.Y. Mar. 4, 2003) ("the crucial question . . . under a false endorsement theory is . . . 'likelihood of confusion'").  Taco Bell does not dispute elements of ownership, validity or use without consent.

"was nothing more than a print ad" (Raymond Decl., Ex. 9, Complaint at ¶ 5)[3] through which "Taco Bell stole . . . the endorsement of mega-celebrity Jackson" (*id.* ¶ 6) with the result that "many consumers believed that 50 Cent had agreed to endorse Taco Bell's products" (*id.* ¶ 7).[4] *See Rogers v. Grimaldi*, 875 F.2d 994, 1000 (2d Cir. 1989) (plaintiff's claim under Lanham Act for false endorsement by using name in movie title was "essentially" one of false advertising).

Jackson's claim is not merely one of false endorsement advertising; it is a claim of false *implied* advertising. It can be nothing else as the express language of the Offer Letter explicitly and repeatedly makes clear that it is an offer to Jackson, not a representation that Jackson agreed to do anything or endorse Taco Bell. The letter states early "So here's our offer of change to you" and concludes with Taco Bell's aspiration that "we hope you accept our offer." The letter explains the terms of the offer and what Taco Bell "will" do if Jackson accepts the offer (*e.g.*, "we'll serve the guests", "we'll also make a $10,000 contribution"). (TB Facts 28, 84; Gould Decl., Ex. 19.) This case thus is not like the Woody Allen look-a-like case cited by Jackson (Br. at 15-16), which did not involve an offer to the celebrity. The use of 50 Cent's name cannot "inescapably" be interpreted as an endorsement because the Offer Letter's language expressly makes an offer and does not say that 50 Cent has agreed to anything. A copy of the entire Offer Letter appears on the next page.

---

[3] *See also id.* at ¶ 24 (letter was "nothing more than a transparent commercial advertisement"); *id.* at ¶ 26 (letter was "purely a commercial advertisement").

[4] *See also id.* at ¶ 31 (alleging confusion as to endorsement and sponsorship).

4



**Greg Creed**
President

**Taco Bell Corp.**
17901 Von Karman
Irvine, CA 92614

June 18, 2008

Mr. Curtis Jackson aka 50 Cent
c/o Joanne Wiles
William Morris Agency
One William Morris Place
Beverly Hills, CA 90212

Dear Mr. Jackson,

We know that you adopted the name 50 Cent years ago as a metaphor for change. We at Taco Bell are also huge advocates of change. In fact, for just a few spare coins, we're giving consumers more variety for less money with our new 79-89-99 *Why Pay More* value menu. Where else can you get a Cheesy Double Beef Burrito for only $.89?

So here's our offer of change to you: For one day this summer, change your name to either 79 Cent, 89 Cent or 99 Cent by showing up to one of our more than 5,600 locations nationwide and rapping your order in the drive thru with your new moniker.

We'll serve the guests of the chosen location with plenty of free Why Pay More menu items. And we'll reward more than just customers –we'll also make a $10,000 contribution to a charity of your choice that they can take "Straight to the Bank."

Inspiration for your rap can be found at www.tacobell.com/valuemenu with our "Why Pay Mo' Rhyme Generator." Just upload your picture and watch change happen. We encourage you to "Think Outside the Bun" and hope you accept our offer.

Sincerely,

*Greg Creed*

Greg Creed

President
Taco Bell Corp

Some courts have recognized that in the celebrity false endorsement context, the traditional likelihood of confusion factors do not squarely apply and require modification. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1019 (3d Cir. 2008) (traditional confusion factors are "uncomfortable fit" for celebrity false endorsement); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007-08 (9th Cir. 2001) (tailoring factors for false endorsement). The Second Circuit has not considered whether and to what extent the LOC factors should be modified for a celebrity false endorsement case, but it has addressed how to assess Lanham Act claims based on implied falsehood.

To establish a claim of implied falsity, a plaintiff *must* present admissible extrinsic evidence of the message alleged to be communicated. *Johnson & Johnson\*Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297-98 (2d Cir. 1992). As the Court explained: "the question in such cases is-what does the person to whom the advertisement is addressed find to be the message?" *Id.* (citing earlier cases). "[T]he success of a plaintiff's implied falsity claim" thus "usually turns on the persuasiveness of a consumer survey" showing "that a not insubstantial number of consumers" hold the false belief allegedly communicated. *Id.* at 298; *see also Time Warner Cable, Inc. v. DirecTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (for implied claims "the district court must look to consumer data to determine what 'the person to whom the advertisement is addressed find[s] to be the message.'") (quoting earlier cases). Absent a threshold showing that consumers took away the particular message alleged, "an implied falsehood claim must fail." 960 F.2d at 298.

Jackson has no evidence by which a jury could conclude that recipients of the Offer Letter were likely to take away the message that Jackson endorsed or sponsored Taco Bell. Jackson has submitted no survey in support of his motion. That is noteworthy because Jackson

in fact ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████

        Meanwhile, ample evidence shows that recipients of the Offer Letter in fact were

*not* confused.  Other than Jackson and his agents ███████████████████████, the

only other recipients of the Offer Letter were news outlets presented with an opportunity to

report news of the offer.  Notably, *all* of the more than 150 news articles produced in the case

that reported on the Offer Letter or its aftermath, including Jackson's response and the filing of

his lawsuit, accurately reported the Offer Letter as exactly what it was – an offer, not an agreed

endorsement.  (TB Facts 120.)  Dr. Michael Mazis, who has served as an expert to the FDA and

FTC in analyzing consumer perception and confusion, reviewed all the articles and found none

demonstrating that anyone who received and reported about the Offer Letter perceived a message

that Jackson had agreed to the offer's terms or endorsed Taco Bell.  (TB Facts 121.)

        Jackson points to one headline repeated in a few websites stating "50 Cent To

Change His Name To 79 Cent For Taco Bell".  (Jackson Br. at 18.)  But Jackson overlooks that

_____

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

the headline was immediately followed by the statement that "50 Cent *has been asked* to change

his name . . ." and other language accurately indicating that there was no agreement by 50 Cent

but rather only an offer by Taco Bell.  (TB Facts 57.)  Thus, the headline is no proof that the

story's author was confused, and, even if it were, would not nearly meet the threshold incidence

rate of confusion required.[6]

   Jackson also cites to a handful of comments from users of "mediatakeout.com" as

evincing a belief that Jackson endorsed Taco Bell.  (Jackson Br. at 18.)  There are three

insurmountable problems with this evidence.  First, the user comments are not reactions to or

perceptions of the Offer Letter.  Rather, they are responses to reports or postings about the offer

and thus not responses to anything authored or disseminated by Taco Bell or its public relations

firm.  Second, the comments are unauthenticated and exactly the type of internet "blog" or

message postings found inadmissible or otherwise insufficient to establish confusion.  *E.g., Univ.*

*of Kan. v. Sinks,* 565 F. Supp.2d 1216, 1267 (D. Kan. 2008) (blog comments insufficient to

establish confusion as matter of law); *Blue Bell Creameries, L.P. v. Denali Co., LLC,* 2008 U.S.

Dist. Lexis 58083 at *14-15 (S.D. Tex. July 31, 2008) (rejecting blog postings as evidence of

confusion because, as here, "[n]othing is known about the persons who made the entries, about

whether they are related in any way to either party or whether they are describing true events and

impressions").[7]

---

[6] *See* note 5 above.

[7] *See also U.S. Conf. of Catholic Bishops v. Media Research Ctr.,* 432 F. Supp.2d 616, 629 (E.D. Va.
2006) (several blog postings deemed merely anecdotal and *de minimis*); *Echo Drain v. Newsted,* 307 F.
Supp.2d 1116, 1126 (C.D. Cal. 2003) (holding a "few unauthenticated e-mails and webpostings standing
alone are not sufficient evidence of actual confusion").

The third deficiency of the blog entries is that many are ambiguous and thus even if deemed admissible, would not establish confusion. Dr. Mazis reviewed all the blog and message postings in the case and found only 1 out of more than 150 that displays confusion about the offer. (TB Facts 57, 123.) And even that entry responds to an article about the offer, not to the Offer Letter itself or anything that Taco Bell or its public relations firm authored or disseminated. Accordingly, it not only is *de minimis*, it is irrelevant.

While recognizing the "uncomfortable fit" of the traditional confusion factors to false endorsement cases, the Third Circuit in *Facenda* rejected the argument that the standard for implied false advertising cases should be applied to a false endorsement claim. 542 F.3d at 1019-22. *Facenda* erred in that respect – the traditional confusion factors, even when modified for false endorsement cases, do not accomplish what is first required in an implied false claim case: determining the message received. In any event, *Facenda* was not presented with the case that exists here – an express *offer to the celebrity* made in what is alleged to be advertising as opposed to advertising allegedly using the celebrity to make an offer to consumers. Jackson has no admissible evidence that the Offer Letter communicated an implied message that Jackson endorsed or sponsored Taco Bell and thus has no Lanham Act claim.

## II

### DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT FOR JACKSON UNDER TRADITIONAL LIKELIHOOD OF CONFUSION ANALYSIS

Even if the Court were to apply the traditional LOC factors to Jackson's claims, those factors demonstrate no likelihood of confusion. At the very least, there are disputed issues of material fact requiring denial of Jackson's motion. The factors must demonstrate a "'probability of confusion, not a mere possibility'", among "numerous ordinary prudent purchasers". *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004)

(quoting earlier 2nd Circuit cases). Each of the predicate factors are questions of fact. *Estee Lauder v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997) (the "finding as to each individual [*Polaroid*] factor is one of fact"). "The bottom line on a motion for summary judgment is not how many factors favor each side but whether a reasonable trier of fact might differ as to the likelihood of confusion." *Physicians Formula Cosmetics, Inc. v. West Cabot Cosmetics, Inc.*, 857 F.2d 80, 85 (2d Cir. 1988).

     **A.**     **Offer Letter's Language:**  One of the most salient factors is the letter's text.[8]  As set forth earlier, the Offer Letter repeatedly and expressly uses "offer" language and sets forth what Taco Bell "will" do if Jackson were to "accept" the offer. The Offer Letter does not make any claim or suggestion of endorsement, sponsorship or affiliation.

     **B.**     **Strength of Mark:**  The strength of a mark refers to its distinctiveness "or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source." *W.W.W. Pharm. Co. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir. 1993). There are two aspects of a mark's relative strength. One is inherent distinctiveness; the other is acquired distinctiveness (also known as "secondary meaning"). *Virgin Enter. Ltd. v. Nawab*, 335 F.3d 141, 147 (2d Cir. 2003).

     Jackson's brief does not argue that Jackson's mark is inherently distinctive.[9] Instead, it relies on acquired distinctiveness by setting forth hearsay statements from an unauthenticated ███████████ purportedly showing that the name 50 Cent is well-known

---

[8] The letter's language is not a traditional *Polaroid* factor, but as noted earlier the factors identified in *Polaroid* are non-exclusive. Moreover, the context in which a mark or name appears is highly relevant to the confusion analysis. *See* Point II(C) below discussing similarity of marks in context.

████████████████████████████████████████████████████

9

and a news article reporting on a potentially lucrative marketing deal.  (Jackson Br. at 17.)
Putting aside the evidentiary limitations, merely being well-known and having past or potential
marketing success do not establish strength:  "Popularity and sales alone cannot establish
secondary meaning."  *Ralston Purina Co. v. Thomas J. Lipton, Inc.* 341 F. Supp. 129, 134
(S.D.N.Y. 1972).[10]  Jackson's evidence suggests his name is well-known, but it does not establish
that consumers identify his mark as a source for particular goods or services.

      Moreover, in a false endorsement case, the question is not merely whether the
plaintiff is well known but rather "the extent to which plaintiff has developed a *favorable*
association for his mark in the public's mind."  *Allen v. National Video, Inc.,* 610 F. Supp. 612,
627 (S.D.N.Y. 1985) (emphasis added); *Tin Pan Apple, Inc. v. Miller Brewing Co.*, 737 F. Supp.
826, 834 (S.D.N.Y. 1990).  There is ample evidence that to many, Jackson's image is far from
favorable.  For example, the same ▮▮▮▮ evaluation cited by Jackson shows that of those
recognizing the name 50 Cent, ▮▮▮ dislike him a lot, ▮▮▮ dislike him and ▮▮▮ dislike him
some, with only ▮▮▮ liking him at least some and a mere ▮▮▮ liking him a lot.  (TB Facts 1;
Gould Decl., Ex. 20.)  Other examples include negative statements about 50 Cent in the press
and on the internet.  (TB Facts 1; *see, e.g.,* Gould Decl., Ex. 2 at J00013.)  There thus is a dispute
as to whether Jackson is viewed favorably for purposes of having a strong mark.

      **C.**    **Similarity of Marks:**  In inviting Jackson to "change your name" for a
day "to either 79 Cent, 89 Cent or 99 Cent", the Offer Letter naturally referred to Jackson's stage
name, "50 Cent".  In that sense the mark used by Taco Bell was similar, indeed the same, as

---

[10] *See also Metro Kane Imports, Ltd. v. Rowoco, Inc.*, 618 F. Supp. 273, 276 (S.D.N.Y. 1985) ("as a
general rule popularity, sales, and advertising expenditures are demonstrative of only an effort to establish
secondary meaning, not success of that effort") *aff'd*, 800 F.2d 1128 (2d Cir. 1986).

Jackson's. But in the sense that counts – the trademark sense – they were not. That is because the Offer Letter made no reference to 50 Cent as a trademark denoting or endorsing Taco Bell's goods or services. The name 50 Cent only appears two places in the Offer Letter. One is in the address block, and the other is in the first line saying "We know you adopted the name 50 Cent years ago as a metaphor for change." Neither uses the words "50 Cent" to endorse Taco Bell's goods or services or portray Taco Bell as offering "50 Cent" brand goods or services. Rather, the two references to "50 Cent" appear merely in the context of making an offer to him. Accordingly, the similarity factor does not favor Jackson, let alone indisputably so. *See, e.g.,* *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 962 (2d Cir. 1996) (similarity of marks must be evaluated in context of "how they are presented in the marketplace"); *Brockmeyer v. Hearst Corp.*, 248 F. Supp.2d 281, 295-96 (S.D.N.Y. 2003) (same).

      **D.**    **Proximity of Products:** This "inquiry concerns whether and to what extent the two products compete with each other." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996). The closer the goods or services of the parties are to each other, "the more likely that the consumer will mistakenly assume a common source." *Virgin Enters. v. Nawab*, 335 F.3d 141, 149 (2d Cir. 2003). "[A]ll aspects of the products" are relevant to this determination, "including price, style, intended uses, target clientele, typical distribution channels, and others." *Brockmeyer*, 248 F. Supp.2d at 296.

      Taco Bell's products and services are a far cry from Jackson's. Taco Bell provides Mexican style quick serve restaurant ("QSR") services and food products. In contrast, Jackson performs music as 50 Cent and licenses 50 CENT as a mark for use in connection with goods such as ringtones, video games, clothing and concert-related merchandise. Notably, Jackson has

11

no trademark registration for 50 CENT in connection with restaurant services.  (TB Facts 5; *see* Raymond Decl., Ex. 9 at Ex. A.)

Jackson ignores all that, focusing instead on only one aspect of the proximity analysis – similarity of target clientele – and even within that aspect focusing on one narrow demographic characteristic – age (███ year olds).  (Jackson Br. at 17).  Having a similar audience age group may be relevant but is far from determinative.  Countless products and services are targeted to ███ year olds, but that does not mean any two such products or services using similar marks will create confusion.  *See, e.g., Mejia & Assocs., Inc. v. IBM Corp.*, 920 F. Supp. 540, 548 (S.D.N.Y. 1996) (no proximity between defendant's computer products and plaintiff's how-to-start home-based business services because of different purpose in targeting audience); *Inc. Pub. Corp. v. Manhattan Magazine, Inc.*, 616 F. Supp. 370, 381, 385 (S.D.N.Y. 1985) (despite overlapping general target demographic for competing magazines, proximity factor weighed in favor of defendant because of editorial, style and geographic differences) *aff'd*, 788 F.2d 3 (2d Cir. 1986).

Given the non-competitive status of the parties' products and services, the proximity factor favors Taco Bell.  At best for Jackson, there are factual disputes about the extent to which attributes of proximity other than the age demographic support his claim.

E.      **Bridging the Gap:**  This factor refers to "the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so."  *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005). Jackson incorrectly argues that "where the parties are not true competitors, this *Polaroid* factor is of less utility."  (Jackson Br. at 17).  To the contrary, this factor is irrelevant when, unlike here,

12

parties are true competitors. *Star Indus.*, 412 F.3d at 387 (if the "products are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant").



**[REDACTED]**

**[REDACTED]**

      **F.**    **Actual Confusion:**  As detailed earlier in Point I, Jackson has no

admissible evidence of actual confusion: **[REDACTED]**

**[REDACTED]** ; no news media were confused in

their reporting; and unauthenticated blog entries responding to internet chatter rather than to the

Offer Letter are ambiguous at best.  Even if admissible, such isolated or anecdotal evidence of

confusion does not by itself establish actual confusion and, to the contrary, is insufficient to

support finding a likelihood of confusion.  *E.g.*, *WE Media, Inc. v. Cablevision Cys. Corp.*, 94

Fed. Appx. 29, 32 (2d Cir. 2004) (emails and voice messages expressing confusion as to

relationship of parties was insufficient to support actual confusion); *Nora Bevs., Inc. v. Perrier

Group of Am.*, 269 F.3d 114, 123-24 (2d Cir. 2001) (anecdotal testimony regarding anonymous

consumers was *de minimis* and insufficient).

      **G.**    **Good or Bad Faith:**  The good faith factor looks at the extent to which

the defendant attempts "to exploit the good will and reputation of a senior user by adopting the

mark with the *intent to sow confusion* between the two companies' products."  *Star Indus.*, 412

F.3d at 388 (emphasis added).[12]  The key is intent not merely to use someone's mark without

consent, but rather *to confuse*, which makes sense as the inquiry for which it is considered is

determining whether there is a likelihood of confusion.

---

**[REDACTED]**

[12] *See also Medici Classics Prods. LLC v. Medici Group LLC*, 590 F. Supp.2d 548, 556 (S.D.N.Y. 2008)
(same); *Johnson & Johnson Consumer Cos. v. Aini*, 540 F. Supp.2d 374, 391 (E.D.N.Y. 2008) (same).

14

"[S]ubjective issues such as good faith are singularly inappropriate for determination on summary judgment." *Cadbury Beverages, Inc.*, 73 F.3d at 483 (declining to find bad faith as matter of law). Good faith "like many intent issues, is best left in the hands of the trier of fact." *The Sports Auth.*, 89 F.3d at 964. That maxim applies with particular force here. The record is devoid of any testimony, documents or other evidence that Taco Bell sought to create consumer confusion. Meanwhile, there are numerous pieces of evidence on which a jury could find that Taco Bell did *not* act in bad faith, let alone bad faith to cause confusion. Among others:



Jackson sets forth his own list of evidentiary snippets he contends indicate Taco Bell's bad faith. (Jackson Br. at 19.) But none of those demonstrates any intent to create confusion -- as opposed to intent to use the name 50 Cent in the Offer Letter -- and all are taken out of context and disputed as set forth in Taco Bell's Response to Jackson's Statement of Undisputed Facts.[13] In any event, Jackson's list, together with Taco Bell's list of evidence of good faith set forth above, aptly demonstrate the existence of material issues of disputed fact as to good faith precluding summary judgment in Jackson's favor.

H.      **Quality of Products/Services:** Taco Bell agrees that the quality of products or services is not germane to the LOC analysis in the context of a false endorsement case.[14] (Jackson Br. at 20.) But Jackson improperly tries to recast this factor as one of quality control. The sole case Jackson cites for his novel proposition is a "genuine goods" or "parallel imports" case that was not concerned with the *Polaroid* product quality factor. *El Greco* instead involved sales of shoes by a foreign company whose license terminated but subsequently shipped authentic branded shoes into the U.S. *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 393-94 (2d Cir. 1986). The Court held that distribution of "genuine" goods could be a trademark violation where the owner no longer had control over quality of the goods. *Id.* at 395-96. As a "genuine" goods case, *El Greco* is inapt here. If Jackson's argument were valid, the

---

[13] *See* Taco Bell's Response to Jackson's 56.1 Statement at 19, 21, 23, 27, 30, 31, 38, 40, 41, and 45.

[14] *See, e.g., Downing*, 265 F.3d at 1007-08 (not considering quality as a factor); *Tin Pan Apple*, 737 F. Supp. at 834 (same). But contrary to Jackson's contention, in a conventional trademark case the "actual quality" of products is relevant to the LOC analysis. *E.g., Streetwise Maps, Inc. v. VanDAM, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998). In any event, Taco Bell is the leading Mexican-style quick serve restaurant in the U.S. (TB Facts 59, 72), and Jackson has made no argument that Taco Bell serves inferior quality products.

16

product quality factor would always favor the plaintiff because the plaintiff never has control over the defendant's use. That is not the law.

I.    **Sophistication of Consumers:**  There are two basic problems with Jackson's view of consumer sophistication. First, Jackson's brief offers no factual support for its conclusory statement that "Taco Bell's target demographic of ██████ olds . . . are not the most sophisticated consumers in the market." (Jackson Br. at 20.) Not only is this statement conclusory and overly generalized about all ██████ olds, but it merely states the irrelevant point that such consumers are not "the most" sophisticated. Those consumers, even if not "the most" sophisticated, may well be sufficiently sophisticated to understand the obvious difference between an expressly stated humorous offer and an accepted deal. Indeed, the facts regarding the absence of confusion discussed above show that they do.

Second, Jackson's brief wrongly assumes Taco Bell's customers are the relevant audience for determining whether the Offer Letter caused confusion. The Offer Letter was not published in any newspaper, magazine, internet site or anywhere else. Rather, it was provided to news outlets to report news of the offer if they chose to do so. Although some outlets did report about the offer, none reproduced the Offer Letter, choosing instead to quote selectively from it and reciting the letter's "offer" language.[15] The relevant audience for determining confusion by those who were exposed to the Offer Letter thus was not Taco Bell's restaurant patrons but rather the news media. The news media investigate and report news and can be expected to have a relatively high level of sophistication at least with respect to understanding items such as the

---

[15] *See, e.g.,* Gould Decl., Ex. 36, OK! Magazine (quoting "offer" language); Gould Decl., Ex. 56 at 2315, Celebrity Truth (same); and at 2320, MusicNews.com (same).

17

Offer Letter.  Indeed, as noted earlier, all media who reported the story correctly reported it as an "offer" or "challenge".

In sum, numerous disputed issues of material fact concerning alleged likelihood of confusion preclude summary judgment for Jackson.

## III

## TACO BELL HAS SUBSTANTIAL
## DEFENSES TO THE LANHAM ACT CLAIMS

In addition to disputed issues of material fact on Jackson's Lanham Act claims, disputed issues of fact preclude summary judgment against Taco Bell's substantial affirmative defenses to those claims, including:  (A) nominative fair use, which Jackson overlooks by attacking the unasserted defense of descriptive fair use, and (B) the First Amendment and its protection of newsworthy matters, which Taco Bell asserts as a defense to the Lanham Act claims, not the state law right of publicity claim on which Jackson bases his arguments.

### A.     Use Of Jackson's Name Was Nominative Fair Use

The nominative fair use defense allows use of a plaintiff's trademark where the purpose of using the mark is to describe the plaintiff or its products rather than the defendant's products.  The defense was first set forth by the Ninth Circuit in *New Kids On The Block v. News America Publishing,* 971 F.2d 302 (9th Cir. 1992), which held that the defendant's use of a popular band's trademark in connection with a contest run by the defendant was fair use.  The *New Kids* court distinguished between nominative fair use and descriptive fair use, where the defendant uses the plaintiff's mark to describe the defendant's own goods or services.  972 F.2d at 308.  Jackson's arguments against Taco Bell's fair use defense misfire because they concern descriptive fair use, not nominative fair use.  (Jackson Br. at 21-22.)

18

Although the Second Circuit has not had occasion to render a holding with respect to the nominative fair use defense,[16] district courts within the Circuit have adopted and applied the defense as articulated by the Ninth Circuit. *E.g., Audi AG v. Smith*, 592 F. Supp.2d 246, 269-70 (N.D.N.Y. 2008) ("the district courts in this circuit that have discussed a nominative fair use defense, all have followed the standard set forth by the Ninth Circuit in *New Kids*"); *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp.2d 463, 496 (S.D.N.Y. 2008) (finding nominative fair use).

Moreover, nominative fair use has been applied and upheld in cases involving claims by celebrities premised on trademark infringement and false endorsement. *E.g., New Kids*, 972 F.2d at 307-09; *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1155 (9th Cir. 2002) (use of Princess Diana's name and likeness in producing, advertising and selling collectibles bearing her name was nominative fair use); *Clark v. America Online, Inc.*, 2000 U.S. Dist. Lexis 17368 at *14(C.D. Cal. Nov. 30, 2000) (denying plaintiff's motion for summary judgment; use of Dick Clark's name on advertising mailers stating "If you danced to the Beatles, cruised in a Thunderbird, or tuned into Dick Clark, you have earned . . . 100 hours free [Internet service on AOL]" was nominative fair use); *see also Tiffany*, 576 F. Supp.2d at 497 (eBay's use of Tiffany marks to describe items sold on eBay was nominative fair use).

Nominative fair use has three elements: "[f]irst, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or

---

[16] *See Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 143 n.4 (2d Cir. 2005) (finding it unnecessary to reach the nominative fair use argument); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 156 (2d Cir. 2002) (recognizing that certain conduct "may" constitute fair use under *New Kids*).

endorsement by the trademark holder." *Tiffany*, 576 F. Supp. at 496 (citing *New Kids*, 971 F.2d at 308). As recognized in *Tiffany*, "mere use of a trademarked term to describe something is not enough to suggest sponsorship or endorsement." *Id.* at 497.

Taco Bell's use of 50 Cent's mark fits the defense to a tee. First, there is no way to make an offer to 50 Cent that involves changing his name without referring to that name. That is exactly what the Offer Letter did. Second, the Offer Letter made limited use of the mark, referring to it only in the address block and the first line. Third, the letter nowhere suggested sponsorship or endorsement. To the contrary, the letter explicitly made an offer to 50 Cent. To the extent Jackson points to evidence of intent or confusion, that at best creates disputed fact issues as to the third element and does not warrant summary judgment against the defense.

**B.      The First Amendment and Newsworthiness Defense**

Jackson's brief argues that the First Amendment is no defense to his right of publicity claim (Jackson Br. at 9-14) but makes no effort to argue it is not a defense to the Lanham Act claims. The First Amendment protection afforded news, commentary and expressive works requires narrow application of the Lanham Act when those matters are in play:

> when unauthorized use of another's mark is part of a communicative message and not a source identifier, the First Amendment is implicated in opposition to the trademark right. In recognition of this potential conflict, the Second Circuit has construed the Lanham Act narrowly when the unauthorized use of the trademark is for the purpose of a communicative message, rather than identification of product origin. Thus, where the unauthorized use of a trademark is for expressive purposes of comedy, parody, allusion, criticism, news reporting, and commentary, the law requires a balancing of the rights of the trademark owner against the interests of free speech.

*Yankee Publ'g, Inc. v. News Am. Publ'g, Inc.*, 809 F. Supp. 267, 276 (S.D.N.Y. 1992), *citing*

*Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989) (movie title referring to Ginger Rogers)

20

and *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc.*, 886 F.2d 490, 493-95 (2d Cir. 1989) (parody of Cliffs Notes).

The First Amendment is implicated here because Jackson complains about distribution of the Offer Letter to the news media. Had Taco Bell's public relations firm not provided the Offer Letter to news media, this case would be about nothing more than a private offer made to Jackson. Indeed, Jackson makes no claim that his rights were violated by sending the Offer Letter to him or his agent. Rather, Jackson complains that the offer was disclosed in the press. But reporting newsworthy matters is classic First Amendment speech. *Cf. Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 138 (2d Cir. 1984) ("We cannot accept a view that a publication must meet an independent standard of newsworthiness to stand under the umbrella of First Amendment protection. . . . The compass of the First Amendment covers a vast spectrum of tastes, views, ideas and expressions").

Taco Bell's offer to Jackson was eminently newsworthy. Jackson has admitted ███████████████████████████████████████████████████████ ████████████████████████████████████████ Likewise, the public is interested in corporate charitable contributions. (TB Facts 110.) Confirmation of public interest in and newsworthiness of the offer is demonstrated most vividly by the fact that celebrity news and other media reported the story, both at the outset and then when Jackson responded belligerently and yet again when he sued. (TB Facts 113, 117.)

The coverage and interest also confirms that the Offer Letter is not merely an advertisement that would be pure commercial speech and thus less deserving of full First Amendment protection. *See Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 906 (9th Cir. 2002) ("If speech is not 'purely commercial' – that is, if it does more than propose a commercial

transaction – then it is entitled to full First Amendment protection") (*citing Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185-86 (9th Cir. 2001)).  On its face, the Offer Letter is an offer to Jackson, which the news reported as such, and at the very least there is a dispute as to whether the Offer Letter is an ad or an offer or some combination of both.

An additional disputed material issue of fact arises out of the First Amendment "balancing" test that weighs likelihood of consumer confusion against the user's First Amendment right of expression.  *See Cliffs Notes,* 886 F.2d at 494.  The finding of likelihood of confusion "must be particularly compelling to outweigh the First Amendment interest . . . ." *Twin Peaks Prods., Inc. v. Publications Int'l, Inc.*, 996 F.2d 1366, 1379 (2d Cir. 1993).  Because the balancing test requires assessment of likelihood of confusion, at an even more exacting level, the same disputed fact issues that preclude summary judgment on the LOC analysis also preclude it against Taco Bell's First Amendment and newsworthiness defense.

## IV

### DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT OF JACKSON'S ENTITLEMENT TO MONETARY DAMAGES

For the same reasons that summary judgment should be denied on Jackson's liability claims under the Lanham Act, so should his bid for summary judgment of entitlement to monetary damages.  Without summary judgment of liability, there can be no basis for summary judgment as to damages.  *See Bowen v. New York News, Inc.*, 522 F.2d 1242, 1259 (2d Cir. 1975) (where "[n]o liability exists . . . no damages may be awarded").

Moreover, even if liability were established, Jackson would not automatically be entitled to damages.  As Jackson argues, a plaintiff seeking monetary damages must demonstrate actual confusion, as opposed to the likelihood of confusion required to establish liability.

(Jackson Br. at 23).  As discussed above, Jackson has no admissible proof of actual confusion caused by the Offer Letter.

Jackson's alternative ground for judgment on monetary damages is that actual confusion should be presumed based on Taco Bell's intent to cause confusion.  This argument fails for multiple reasons.  As set forth in the LOC analysis, there is no evidence that Taco Bell intentionally sought to confuse consumers; at the very least this quintessential factual issue of subjective intent is disputed.  Furthermore, Taco Bell's proof of the absence or *de minimis* nature of any confusion overcomes the presumption, which is rebuttable.  *See Georg Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992).

Finally, the case on which Jackson relies for the presumption – *PPX Enters. Inc. v. Audiofidelity Enters. Inc.*, 818 F.2d 266 (2d Cir. 1981) – repeatedly emphasized that excusing the plaintiff from providing evidence of actual confusion to obtain damages was unique "under the circumstances of this case".[17]  818 F.2d at 268, 272.  While the Second Circuit has since expanded the presumption to shift the parties' respective burdens with respect to actual confusion in certain cases,[18] its applicability to cases like this one has been questioned.  *See Tin Pan Apple, Inc. v. Miller Brewing Co.*, 30 U.S.P.Q.2d 1791, 1798 (S.D.N.Y. 1994) (distinguishing *PPX* and its progeny as involving "direct competition in the marketplace between similar products" and

---

[17] In *PPX*, the defendant fraudulently sold music albums containing fake Jimi Hendrix performances.  818 F.2d at 269.  The Court distinguished the case from the typical trademark infringement case as one where the defendant's products were "patently fraudulent".  *Id.* at 273.

[18] E.g., *Resource Developers, Inc. v. The Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 140 (2d Cir. 1991) (stating principle that where plaintiff demonstrates defendant intentionally set out to deceive the public, burden shifts to defendant to demonstrate absence of confusion but not shifting burden because plaintiff provided insufficient proof that defendant intended to deceive customers).

finding the question of whether defendants engaged in intentionally deceptive conduct necessary to trigger presumption, were it to apply, is a triable issue of fact).

## V

### DISPUTED ISSUES OF MATERIAL FACT
### <u>PRECLUDE SUMMARY JUDGMENT ON EXCEPTIONAL CASE STATUS</u>

Pursuant to 15 U.S.C. § 1117(a), a Court may, but is not required to, award attorney fees in a Lanham Act case if the Court determines the case is "exceptional".[19]  But the Court only reaches that question if a party prevails on its Lanham Act claims.  Accordingly, the same myriad disputed issues that preclude summary judgment on Lanham Act liability also preclude summary judgment that the case is exceptional.  Jackson implicitly recognizes this by asking for summary judgment on exceptional case status "[i]f" the Court grants summary judgment on liability on his Lanham Act claims.  (Jackson Br. at 24.)

Even if summary judgment were proper on the merits of Jackson's Lanham Act claims, which it is not, that would not entitle him to summary judgment that this case is exceptional.  An exceptional case under the Lanham Act requires demonstrable fraud or bad faith.  *Gordon & Breach Science Publishers, S.A. v. American Inst. of Physics,* 166 F.3d 438, 439 (2d Cir. 1999) (attorneys fees under Lanham Act should be awarded only in exceptional cases founded "on evidence of fraud or bad faith") (quoting earlier 2nd Circuit cases); *Gidatex, S.r.L. v. Campaniello Imports, Ltd.,* 82 F. Supp.2d 136, 147 (S.D.N.Y. 2000) ("A case does not qualify as 'exceptional' under the Lanham Act without a finding of fraud or bad faith").  As noted

---

[19] Jackson seeks attorneys fees in connection with only his Lanham Act claims; New York right of publicity law does not authorize an award of attorneys fees. *See* N.Y. Civ. Rights Law §§ 50-51.

24

earlier, the bad faith inquiry in Lanham Act cases specifically focuses on bad faith intent to cause

confusion, and there is no evidence of either fraud or bad faith intent to cause confusion.

Moreover, "[t]he mere existence of a finding of bad faith . . . does not

automatically entitle the prevailing party to attorneys' fees." *Gidatex*, 82 F. Supp.2d at 147

(denying fees despite jury finding bad faith) (citing *Int'l Star Class Yacht Racing Ass'n v. Tommy*

*Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir.1996)).  Courts thus often look for other indicia

of bad faith such as abusive litigation tactics, *e.g.*, *Gidatex*, 82 F. Supp.2d at 148-49, of which

there have been none.

### **CONCLUSION**

For the foregoing reasons, Jackson's motion for summary judgment with respect

to his Lanham Act claims, Taco Bell's defenses, entitlement to Lanham Act damages and

exceptional case status should be denied.

Dated:  August 20, 2009

_____
Robert W. Lehrburger
Peter C. Harvey
Jason Gould
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel:  (212) 336-2000
Fax:  (212) 336-2222

Attorneys for Defendant Taco Bell Corp.

25